**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| NEOLAYER LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Case No. _____ |
| v. | § | |
| | § | |
| ASUSTEK COMPUTER, INC., | § | |
| | § | Jury Trial Demanded |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff NeoLayer LLC ("NeoLayer") files this Original Complaint against Defendant ASUSTeK Computer, Inc. ("ASUS" or "Defendant") for patent infringement under 35 U.S.C. § 271. Plaintiff alleges, based on its own personal knowledge with respect to its own actions and based on information and belief with respect to all others' actions, as follows:

### I.        THE PARTIES

1.       Plaintiff NeoLayer LLC ("NeoLayer") is a Texas limited liability company that holds all rights, title, and interests in United States Patent Nos. 8,093,592 (the "'592 Patent), 7,649,583 (the "'583 Patent"), 8,698,712 (the "'712 Patent), 8,330,358 (the "'358 Patent"), 8,674,365 (the "'365 Patent"), 11,088,129 (the "'129 Patent) (collectively, the "Asserted Patents"). NeoLayer has a mailing address and a registered office address at 6275 W. Plano Pkwy Ste. #5132, Plano, TX 75093.

2.      Defendant ASUSTeK Computer, Inc. is a Taiwanese corporation with its principal place of business at Li-de Building No. 15, Li-Te Rd., Beitou District, Taipei City 112, Taiwan, R.O.C. ASUSTeK Computer, Inc. may be served pursuant to Fed. R. Civ. P. 4(f)(1).

## II.    JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action brought by NeoLayer against ASUS arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

4.      ASUS is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute. Tex. Civ. Prac. & Rem. §§ 17.041, *et seq*.

5.      This Court has personal jurisdiction over ASUS at least because ASUS conducts business in this District and throughout the state of Texas.

6.      This Court also has personal jurisdiction over ASUS because ASUS has committed acts of patent infringement in this District and throughout Texas, including selling and offering for sale, products that infringe NeoLayer's Asserted Patents. For example, ASUS authorizes sales of products that infringe NeoLayer's Asserted Patents at Best Buy, Costco, Walmart and other stores located in this District.

7.      This Court also has personal jurisdiction over ASUS because ASUS has placed infringing products into the stream of commerce, with the expectation they will be purchased and used by customers in Texas and in this District, such that customers in Texas and in this District have purchased and used, and continue to purchase and use, ASUS's infringing products, which has allowed ASUS to derive substantial benefits from infringing acts in Texas and in this District.

8.      This Court also has personal jurisdiction over ASUS because ASUS regularly does and solicits business, engaging in other persistent conduct targeting residents of Texas and

residents of this judicial District, and/or derives substantial revenue from infringing goods offered for sale, sold, and imported to and targeting Texas residents and residents of this District vicariously through and/or in concert with its alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers.

9.      Venue is proper in this District against ASUS pursuant to 28 U.S.C. §§ 1391 and 1400(b).

10.      Venue is proper in this District against ASUS under 28 U.S.C. § 1391(c)(3) because ASUS is a foreign corporation that is not a resident of the United States. Venue is also proper in this District against ASUS because ASUS is subject to the personal jurisdiction of this Court as set forth above and has committed patent infringement in this District.

11.      ASUS, through its wholly owned licensing subsidiary ASUS Licensing Technology Inc. ("ATL") and its exclusive licensee Celerity IP, LLC[1], has been a plaintiff to numerous patent infringement cases in this District, thereby availing itself of the power and benefits of this Court.[2] ATL is a Taiwanese corporation, with its principal place of business located at No. 115, Li-De Rd., Beitou District, Taipei, Taiwan, R.O.C.

---

[1] *See* GLS Capital, *GLS Capital Subsidiary, Celerity IP, Expands Global Patent Enforcement with Lawsuits Against Oppo and Xiaomi*, available at https://www.glscap.com/gls-capital-subsidiary-celerity-ip-expands-global-patent-enforcement-with-lawsuits-against-oppo-and-xiaomi/ (last visited December 11, 2025) (Celerity "acts as a service provider and exclusive licensing agent for two Asus-related companies: Innovative Sonic and Asus Technology Licensing.").

[2] *See, e.g.*, *Celerity IP, LLC v. LG Electronics, Inc. et al.*, 2:23-cv-316 (E.D. Tex. June 30, 2023); *Asus Technology Licensing Inc. v. Samsung Electronics Co., Ltd. et al.*, 2:23-cv-409 (E.D. Tex. Sept. 12, 2023); *Asus Technology Licensing Inc. v. AT&T Inc. et al.*, 2:23-cv-486 (E.D. Tex. Oct. 19, 2023); *Celerity IP, LLC v. LG Electronics, Inc. et al.*, 2:24-cv-132 (E.D. Tex. Feb. 23, 2024).

### III.    THE ASSERTED PATENTS

12.    On January 19, 2010, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,649,583 (the "'583 Patent"), entitled "Semiconductor Structure and Fabricating Method Thereof for Liquid Crystal Display Device." A copy of the '583 Patent is attached as Exhibit A. On July 1, 2025, AUO Corporation assigned all of its rights, titles, and interests in the '583 Patent to NeoLayer.

13.    On January 10, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,093,592 (the "'592 Patent"), entitled "Thin Film Transistor Substrate, Electronic Apparatus, and Methods For Fabricating The Same." A copy of the '592 Patent is attached as Exhibit B. On July 1, 2025, AUO Corporation assigned all of its rights, titles, and interests in the '592 Patent to NeoLayer.

14.    On April 15, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,698,712 (the "'712 Patent"), entitled "Pixel Structure of Active Matrix Organic Electroluminescent Display Panel and Method of Making the Same." A copy of the '712 Patent is attached as Exhibit C. On July 1, 2025, AUO Corporation assigned all of its rights, titles, and interests in the '712 Patent to NeoLayer.

15.    On December 11, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,330,358 (the "'358 Patent"), entitled "OLED Illumination Device with Improved Aperture Ratio." A copy of the '358 Patent is attached as Exhibit D. On July 1, 2025, AUO Corporation assigned all of its rights, titles, and interests in the '358 Patent to NeoLayer.

16.    On March 18, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,674,365 (the "'365 Patent"), entitled "Array Substrate and Manufacturing

Method Thereof." A copy of the '365 Patent is attached as Exhibit E. On July 1, 2025, AUO Corporation assigned all of its rights, titles, and interests in the '365 Patent to NeoLayer.

17.    On August 10, 2021, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,088,129 (the "'129 Patent"), entitled "Display Apparatus." A copy of the '129 Patent is attached as Exhibit F. On July 1, 2025, AUO Corporation assigned all of its rights, titles, and interests in the '129 Patent to NeoLayer.

18.    The Asserted Patents are valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

19.    To the extent any marking or notice was required by 35 U.S.C. § 287, NeoLayer has complied with the applicable marking and/or notice requirements of 35 U.S.C. § 287.

## IV.    FACTUAL BACKGROUND

### OLED Technology

20.    An organic light emitting diode ("OLED") includes several layers of material that are stacked together on a substrate. For example, and as shown below, an OLED may include a substrate, an anode, a hole injection layer, a hole transport layer, an emissive layer, a blocking layer, an electron transport layer, and a cathode.



21.    Applying a voltage across an OLED causes electrons to be injected from the cathode and holes to be injected from the anode. The electron-hole pairs formed in an emissive layer recombine to form a high-energy state called an exciton. When the exciton decays, photons (*i.e.*, light) are emitted either through an electroluminescent process or a phosphorescent process, depending on the materials in the emissive layer. The specific color of the light is determined by the chemical structure of the organic molecules in the emissive layer.

22.    OLED panels comprise millions of individual OLEDs, sometimes referred to as OLED pixels or pixel structures, arranged along rows and columns of a substrate (*e.g.*, a glass or plastic substrate). These OLED panels are a core component of many types of electronic devices, such as smartphones, TVs, computer monitors, laptops, tablets, smart watches, and virtual reality ("VR") headsets. There is high consumer demand for OLED devices because of their superior display quality compared to other types of displays, such as liquid crystal displays ("LCDs").

23.    Most modern OLED devices include active-matrix OLED ("AMOLED") panels. AMOLED panels use a combination of thin-film transistors ("TFTs" or "TFT backplane") and capacitors to drive the OLEDs in these panels. AMOLED panels may use different types of TFTs, including low-temperature polycrystalline silicon TFTs ("LTPS TFTs"), a combination of low temperature polycrystalline silicon and oxide TFTs ("LTPO TFTs"), indium gallium zinc oxide TFTs ("IGZO TFTs"), and amorphous silicon TFTs ("a-SI TFTs")

***ASUS's Use of the Patented Technology***

24.    ASUS is a Taiwanese multinational company that designs and manufactures a variety of computer hardware and consumer electronics, including smartphones, laptops motherboards, graphics cards, monitors, and computer peripherals. ASUS sells many of these products under sub-brands, including Republic of Gamers, which sells products marketed to gamers, and ProArt, which sells products marketed to content creators. ASUS sells these products

across the world, including the United States, on its online store and via retailers, such as Amazon, Newegg, Best Buy, Walmart, and Micro Center. ASUS has been selling OLED products in the United States since at least 2019, with the release of the ASUS ProArt PQ22UC.[3]

25.    ASUS offers a suite of products with OLED displays, including smartphones, laptops, monitors, and tablets. Third-party manufacturers supply the OLED panels in the OLED products ASUS sells in the United States. Samsung is ASUS's primary supplier of OLED panels. Samsung provides a variety of OLED panels, including quantum dot OLED ("QD-OLED") panels, to ASUS.

26.    ASUS has steadily increased its share of the OLED market in the past few years. In Q3 of 2025, ASUS had the highest share of the global OLED monitor market at 21.9%, surpassing Samsung to claim the top spot. ASUS's recent OLED success stems from increased sales of ROG gaming monitors, ProArt creator monitors, and its portable dual-screen monitors. Overall, global OLED monitor shipments have increased 65% since 2024.

27.    ASUS boasts about the OLED displays in its products. ASUS claims these displays "reproduce colors with superb real-life accuracy for professional grade visuals," offer "ultra-fast response times," provide "wide viewing angles," and "reduce the harmful blue light by up to 70% compared to LCD displays."[4]

28.    According to ASUS, "OLED devices are usually made of 6 components: a substrate, an anode, organic layers, a conducting layer, an emissive layer, and a cathode."[5] "Each

---

[3] OLED-info, *ASUS finally starts shipping its ProArt PQ22UC 21.6″ 4K printed OLED monitor*, available at https://www.oled-info.com/asus-finally-starts-shipping-its-proart-pq22uc-216-4k-printed-oled-monitor (last visited December 16, 2025).
[4] ASUS, *Everything You Need to Know About OLED Laptop Displays*, available at https://www.asus.com/us/content/everything-you-need-to-know-about-oled-laptop-displays  (last visited December 16, 2025).
[5] *Id.*

of these has its own light source, and lights up independently of other pixels, engaging different proportions of the three colors to project your image."[6]

29.    ASUS, since at least 2019, has been making, using, selling, offering for sale, and/or importing into the United States OLED products (the "Accused Products"), including its smartphones, laptops, tablets, monitors, and portable screens, with component(s) that infringe the Asserted Patents.

30.    The Accused Products include, but are not limited to, the following products: ASUS monitors, ASUS laptops, ASUS tablets, ASUS smartphones, ASUS portable screens, and other ASUS accessories that include OLED displays.

31.    ASUS does not have any ownership rights in the Asserted Patents. Additionally, ASUS does not have a license to make, use, sell, or offer for sale, or import into the United States the technology covered by the Asserted Patents.

32.    The Asserted Patents provide many improvements to OLED displays, all of which are realized in Accused Products. The technology covered by the Asserted Patents has helped ASUS increase its sales revenue, its global share of the market for OLED products, and its competitive advantage over its competitors.

33.    In the interest of providing detailed averments of infringement, NeoLayer has identified below at least one claim in each of the Asserted Patents to demonstrate infringement. However, the selection of claims should not be considered limiting, and additional claims of the Asserted Patents that are infringed by ASUS will be disclosed in compliance with the Court's schedule.

---

[6] *Id.*

## V.    COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,649,583 ("'583 PATENT")

34.    NeoLayer re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

35.    NeoLayer is informed and believes, and on this basis alleges, that ASUS, agents of ASUS, and/or third parties acting under ASUS's direction and control, have committed acts of direct infringement under 35 U.S.C. §§ 271(a) and/or 271(g) of the '583 Patent literally and/or under the doctrine of equivalents by making, using, selling, offering to sell, and/or importing within this district and elsewhere in the United States, without authority, products that infringe the '583 Patent, and those products are not materially changed by subsequent process and have not become trivial and nonessential components of another product.

36.    The Accused Products infringe at least one claim of the '583 Patent. By way of example, ASUS's importation and sale of the ASUS ROG Phone 9 AI2501B (the "Accused Phone") in the United States infringes claim 1 of the '583 Patent because the process for manufacturing the Accused Phone infringes claim 1 of the '583 Patent. Claim 1 of the '583 Patent recites:

1. A method for fabricating a semiconductor structure, comprising:

forming a semiconductor layer on a substrate, the semiconductor layer disposed in an active element area and a storage capacitor area of the substrate;

forming a first inter-layer dielectric layer to cover the semiconductor layer;

forming a gate on the first inter-layer dielectric layer in the active element area and a first electrode on the first inter-layer dielectric layer in a storage capacitor area;

performing a doping process to form a source and a drain in the semiconductor layer in the active element area, and a channel is between the source and the drain;

forming a second inter-layer dielectric layer to cover the gate and the first electrode;

forming a patterned conductive layer on the second inter-layer dielectric layer as a pixel electrode;

forming a third inter-layer dielectric layer to cover the patterned conductive layer;

patterning the third inter-layer dielectric layer to expose the patterned conductive layer and forming a plurality of contact windows in the first, second and third inter-layer dielectric layers to expose the source, the drain, a portion of the patterned conductive layer and the first electrode; and

forming a second electrode on the third inter-layer dielectric layer disposed over the first electrode and electrically connected to the first electrode, and a source/drain conductive line electrically connecting the semiconductor layer with the patterned conductive layer.

37.    The process for manufacturing the Accused Phone includes "a method for fabricating a semiconductor structure," as shown in an example below with an AMOLED display.

> The ROG Phone 9 boasts a cutting-edge **6.78" E6 AMOLED** display, featuring adaptive refresh rates that minimize power usage. Ramp up your gaming experience with a **refresh rate of up to 185 Hz**[11] via Game Genie, while enjoying an ultra-responsive **720 Hz touch sampling rate**. With a **peak brightness of 2500 nits**, visibility remains clear even under direct sunlight, ensuring uninterrupted gaming and movie watching. Plus, its **Delta-E < 1 color accuracy** delivers stunningly accurate visuals.

38.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a semiconductor layer on a substrate, the semiconductor layer disposed in an active element area and a storage capacitor area of a substrate," as shown in an example below of a scanning electron microscope view of the semiconductor structure at a cross section where the semiconductor layer is disposed in the active element area and the storage capacitor area of the substrate.



39.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a first inter-layer dielectric layer to cover the semiconductor layer," as shown in an example below where the first inter-layer dielectric layer is covering the semiconductor layer.



40.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a gate on the first inter-layer dielectric layer in the active element area and a first electrode on the first inter-layer dielectric layer in a storage capacitor area," as shown in an example below where the gate is on the first inter-layer dielectric layer in the active element area and the first electrode is on the first inter-layer dielectric layer in the storage capacitor area.



41.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "performing a doping process to form a source and a drain in the semiconductor layer in the active element area, and a channel is between the source and the drain," as shown in an example below of a top-down view of the semiconductor structure, with layers removed to show the source, the drain, and the channel disposed between the source and the drain.



42.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a second inter-layer dielectric layer to cover the gate and the first electrode," as shown in an example below where the second inter-layer dielectric layer is covering the gate and the first electrode.



43.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a patterned conductive layer on the second inter-layer dielectric layer as a pixel electrode," as shown in an example below where the patterned conductive layer is on the second inter-layer dielectric layer and serving as a pixel electrode.



44.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a third inter-layer dielectric layer to cover the patterned conductive layer," as shown in an example below where the third inter-layer dielectric layer is covering the patterned conductive layer.



45.     The method of fabricating the "semiconductor structure" of the Accused Phone comprises "patterning the third inter-layer dielectric layer to expose the patterned conductive layer," as shown in an example below where the third inter-layer dielectric layer exposes the patterned conductive layer.



46.     The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a plurality of contact windows in the first, second and third inter-layer dielectric layers," as shown in an example below where the contact windows are in the first, second and third inter-layer dielectric layers.



47.    For the method of fabricating the "semiconductor structure" of the Accused Phone, the plurality of contact windows "expose the source, the drain, a portion of the patterned conductive layer and the first electrode," as shown below in a top-down view of the semiconductor structure, with layers removed to show the plurality of contact windows exposing the source, the drain, the portion of the patterned conductive layer and the first electrode.



48.    The method of fabricating the "semiconductor structure" of the Accused Phone comprises "forming a second electrode on the third inter-layer dielectric layer disposed over the first electrode and electrically connected to the first electrode, and a source/drain conductive line," as in the examples shown below where the second electrode on the third inter-layer dielectric layer is disposed over the first electrode and electrically connected to the first electrode and the source/drain conductive line is shown.





49. For the method of fabricating the "semiconductor structure" of the Accused Phone, "the source/drain conductive line [is] electrically connecting the semiconductor layer with the patterned conductive layer," as shown in an example below of a top-down view of the semiconductor structure, with layers removed to show the source/drain conductive line electrically connecting the semiconductor layer with the patterned conductive layer.



50.     Based on these representative allegations, ASUS therefore infringes and continues to infringe the '583 Patent under 35 U.S.C. §§ 271(a) and/or 271(g), which is, in part, a process patent, based on the importation, sale, offer for sale, or use of the Accused Products which are made and continue to be made from the '583 Patent's processes patented in the United States and a substantial likelihood exists that the Accused Products were made and continue to be made by the '583 Patent's patented process. The Accused Products are not materially changed by subsequent processes, nor do they become trivial and nonessential components of another product. ASUS is not entitled to the modifications of remedies provided by 35 U.S.C. § 287 based on its (or entities it directs or controls) infringement under 35 U.S.C. 271(g).

51.     Alternatively, and in addition, ASUS directly infringes by making and selling the Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g.*, *Lake Cherokee Hard Drive Techs., LLC v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, ASUS directly infringes through its direct involvement in the activities of its distributors (including related ASUS corporate entities) or subsidiaries, including by selling and offering for sale the Accused Products directly to its distributors or subsidiaries and importing the Accused Products into the United States. ASUS conducts activities that constitute direct infringement. ASUS is also vicariously liable for the infringing conduct performed by others, for example ASUS's distributors and subsidiaries under principles of vicarious liability, including but not limited to the alter ego theory, agency theory, contract terms, and, for example, because ASUS has the right and ability to (and does) direct and

control its distributors' and subsidiaries' infringing acts (including, *e.g.*, the right and ability to stop or limit the infringement), conditions receipt of a benefit to its distributors and subsidiaries on their infringement, and because ASUS receives a direct financial benefit for such infringement.

52.    NeoLayer is also informed and believes, and on this basis alleges, that ASUS has induced infringement of the '583 Patent, in violation of 35 U.S.C. § 271(b), by intentionally aiding and encouraging third parties (including ASUS's vendors, customers, and partners) to use, sell, or offer for sale in the United States and/or import into the United States the Accused Products, having known that the acts it was causing would infringe or have a high probability of infringing the '583 Patent under 35 U.S.C. §§ 271(a) and/or 271(g) and with a specific intent that those performing the acts infringe the '583 Patent.

53.    As a result of ASUS's infringement of the '583 Patent, NeoLayer has been damaged. NeoLayer is entitled to recover for damages sustained as a result of ASUS's wrongful acts in an amount yet to be determined.

54.    ASUS has had actual knowledge of its infringement of the '583 Patent since no later than August 12, 2025, when ASUS received NeoLayer's August 5, 2025 letter alleging that ASUS infringed the '583 Patent. NeoLayer is further informed, and on this basis alleges, that ASUS's infringement of the '583 Patent was deliberate and willful, and, therefore, this is an exceptional case warranting an award of enhanced damages for up to three times the actual damages awarded and attorney's fees to NeoLayer pursuant to 35 U.S.C. §§ 284–285.

55.    The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '583 patent, and therefore NeoLayer has satisfied its obligations under 35 U.S.C. § 287 with respect to the '583 Patent.

## VI.    COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,093,592 ("'592 PATENT")

56.    NeoLayer is informed and believes, and on this basis alleges, that ASUS, agents of ASUS, and/or third parties acting under ASUS's direction and control, have committed acts of direct infringement under 35 U.S.C. §§ 271(a) and/or 271(g) of the '592 Patent literally and/or under the doctrine of equivalents by making, using, selling, offering to sell, and/or importing within this district and elsewhere in the United States, without authority, products that infringe the '592 Patent, and those products are not materially changed by subsequent process and have not become trivial and nonessential components of another product.

57.    The Accused Products infringe at least one claim of the '592 Patent. By way of example, the ASUS ROG Phone 9 AI2501B (the "Accused Phone") infringes claim 1 of the '592 Patent. Claim 1 of the '592 Patent recites:

1. A thin film transistor substrate, comprising:

a substrate;

at least a thin film transistor, disposed on the substrate and comprising:

a semiconductor island, comprising a plurality of sub-grain boundaries, a source region, a drain region, and a channel region disposed between the source region and the drain region, wherein a length of the channel region projected in the substrate is extended along a curve, and the width of the channel region projected in the substrate remains substantially the same in an extending direction of the curve; and

a gate, corresponding to the channel region.

58.    The Accused Phone includes a "thin-film transistor substrate," as shown in an example below of a scanning electron microscope view at a cross section.



59.    The "thin-film transistor substrate" of the Accused Phone comprises "a substrate," as shown in an example below.



60.    The "thin-film transistor substrate" of the Accused Phone comprises "at least a thin film transistor, disposed on the substrate," as shown in an example below where the thin film transistor is disposed on the substrate.



61.    The "at least one thin film transistor" of the Accused Phone comprises "a semiconductor island, comprising a plurality of sub-grain boundaries," as shown in an example below where the semiconductor island comprises a plurality of sub-grain boundaries.



62.    The "at least one thin film transistor" of the Accused Phone comprises "a source region, a drain region, and a channel region disposed between the source region and the drain region," as shown in an example below of a top-down view of the thin-film transistor substrate, with layers removed to show the channel disposed between the source region and the drain region.



63.    For the "at least one thin film transistor" of the Accused Phone, "a length of the channel region projected in the substrate is extended along a curve, and the width of the channel region projected in the substrate remains substantially the same in an extending direction of the curve," as shown in an example below of a top-down view of the thin-film transistor substrate,

with layers removed to show the length of the channel region projected in the substrate extending along the curve and the width of the channel region projected in the substrate remaining substantially the same in the extending direction of the curve.



64.    The "thin-film transistor substrate" of the Accused Phone comprises "a gate, corresponding to the channel region," as shown in the examples below of top-down views of the substrate, with layers removed to show the gate corresponding to the channel region, and a scanning electron microscope view of the substrate at a cross section also showing the gate corresponding to the channel region.





65.    Alternatively, and in addition, ASUS directly infringes by making and selling the Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., LLC v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, ASUS directly infringes through its direct involvement in the activities of its distributors (including related ASUS corporate entities) or subsidiaries, including by selling and offering for sale the Accused Products directly to its distributors or subsidiaries and importing the Accused Products into the United States. ASUS conducts activities that constitute direct infringement. ASUS is also vicariously liable for the infringing conduct performed by others, for example ASUS's distributors and subsidiaries under principles of vicarious liability, including but not limited to the alter ego theory, agency theory, contract terms, and, for example, because ASUS has the right and ability to (and does) direct and control its distributors' and subsidiaries' infringing acts (including, *e.g.*, the right and ability to stop or limit the infringement), conditions receipt of a benefit to its distributors and subsidiaries on their infringement, and because ASUS receives a direct financial benefit for such infringement.

66.     NeoLayer is also informed and believes, and on this basis alleges, that ASUS has induced infringement of the '592 Patent, in violation of 35 U.S.C. § 271(b), by intentionally aiding and encouraging third parties (including ASUS's vendors, customers, and partners) to use, sell, or offer for sale in the United States and/or import into the United States the Accused Products, having known that the acts it was causing would infringe or have a high probability of infringing the '592 Patent under 35 U.S.C. §§ 271(a) and/or 271(g) and with a specific intent that those performing the acts infringe the '592 Patent.

67.     As a result of ASUS's infringement of the '592 Patent, NeoLayer has been damaged. NeoLayer is entitled to recover for damages sustained as a result of ASUS's wrongful acts in an amount yet to be determined.

68.     ASUS has had actual knowledge of its infringement of the '592 Patent since no later than August 12, 2025, when ASUS received NeoLayer's August 5, 2025 letter alleging that ASUS infringed the '592 Patent. NeoLayer is further informed, and on this basis alleges, that ASUS's infringement of the '592 Patent was deliberate and willful, and, therefore, this is an exceptional case warranting an award of enhanced damages for up to three times the actual damages awarded and attorney's fees to NeoLayer pursuant to 35 U.S.C. §§ 284–285.

## VII.    COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,698,712 ("'712 PATENT")

69.     NeoLayer is informed and believes, and on this basis alleges, that ASUS, agents of ASUS, and/or third parties acting under ASUS's direction and control, have committed acts of direct infringement under 35 U.S.C. § 271(a) of the '712 Patent literally and/or under the doctrine of equivalents by making, using, selling, offering to sell, and/or importing within this district and elsewhere in the United States, without authority, products that infringe the '712 Patent.

70.    The Accused Products infringe at least one claim of the '712 Patent. By way of example, the ASUS Notebook PC Q423S (the "Accused Computer") infringes claim 10 of the '712 Patent. Claim 10 of the '712 Patent recites:

10.    A pixel structure of active matrix organic electroluminescent display panel, comprising:

a first light emitting device;

a first driving switching device electrically connected to the first light emitting device for driving the first light emitting device;

a second light emitting device;

a second driving switching device electrically connected to the second light emitting device for driving the second light emitting device; and

at least one addressing switching device electrically connected to at least one of the first driving switching device and the second driving switching device.

71.    The Accused Computer includes "[a] pixel structure of active matrix organic electroluminescent display panel," as shown in an example below.



25

72.    The "pixel structure of active matrix organic electroluminescent display panel" comprises "a first light emitting device," as shown in an example below of a top-down view of the pixel structure, with layers removed to show the first light emitting device.



73.    The "pixel structure of active matrix organic electroluminescent display panel" comprises "a first driving switching device electrically connected to the first light emitting device for driving the first light emitting device," as shown in the examples below of top-down views of the pixel structure, with layers removed to show the first driving switching device electrically connected to the first light emitting device for driving the first light emitting device.





74.    The "pixel structure of active matrix organic electroluminescent display panel" comprises "a second light emitting device," as shown in an example below of a top-down view of the pixel structure, with layers removed to show the second light emitting device.



75. The "pixel structure of active matrix organic electroluminescent display panel" comprises "a second driving switching device electrically connected to the second light emitting device for driving the second light emitting device," as shown in the examples below of top-down views of the pixel structure, with layers removed to show the second driving switching device electrically connected to the second light emitting device for driving the second light emitting device.





76.    The "pixel structure of active matrix organic electroluminescent display panel" comprises "at least one addressing switching device electrically connected to at least one of the first driving switching device and the second driving switching device," as shown in an example below of a top-down view of the pixel structure, with layers removed to show the at least one addressing switching device electrically connected to the first driving switching device.



77. Alternatively, and in addition, ASUS directly infringes by making and selling the Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g.*, *Lake Cherokee Hard Drive Techs., LLC v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, ASUS directly infringes through its direct involvement in the activities of its distributors (including related ASUS corporate entities) or subsidiaries, including by selling and offering for sale the Accused Products directly to its distributors or subsidiaries and importing the Accused Products into the United States. ASUS conducts activities that constitute direct infringement. ASUS is also vicariously liable for the infringing conduct performed by others, for example ASUS's distributors and subsidiaries under principles of vicarious liability, including but not limited to the alter ego theory, agency theory, contract terms, and, for example, because ASUS has the right and ability to (and does) direct and control its distributors' and subsidiaries' infringing acts (including, *e.g.*, the right and ability to stop or limit the infringement), conditions receipt of a benefit to its distributors and subsidiaries on their infringement, and because ASUS receives a direct financial benefit for such infringement.

78. NeoLayer is also informed and believes, and on this basis alleges, that ASUS has induced infringement of the '712 Patent, in violation of 35 U.S.C. § 271(b), by intentionally aiding and encouraging third parties (including ASUS's vendors, customers, and partners) to use, sell, or offer for sale in the United States and/or import into the United States the Accused Products, having known that the acts it was causing would infringe or have a high probability of infringing the '712

Patent under 35 U.S.C. § 271(a) and with a specific intent that those performing the acts infringe the '712 Patent.

79.     As a result of ASUS's infringement of the '712 Patent, NeoLayer has been damaged. NeoLayer is entitled to recover for damages sustained as a result of ASUS's wrongful acts in an amount yet to be determined.

80.     ASUS has had actual knowledge of its infringement of the '712 Patent since no later than August 12, 2025, when ASUS received NeoLayer's August 5, 2025 letter alleging that ASUS infringed the '712 Patent. NeoLayer is further informed, and on this basis alleges, that ASUS's infringement of the '712 Patent was deliberate and willful, and, therefore, this is an exceptional case warranting an award of enhanced damages for up to three times the actual damages awarded and attorney's fees to NeoLayer pursuant to 35 U.S.C. §§ 284–285.

## VIII.    COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 8,330,358 ("'358 PATENT")

81.     NeoLayer is informed and believes, and on this basis alleges, that ASUS, agents of ASUS, and/or third parties acting under ASUS's direction and control, have committed acts of direct infringement under 35 U.S.C. § 271(a) of the '358 Patent literally and/or under the doctrine of equivalents by making, using, selling, offering to sell, and/or importing within this district and elsewhere in the United States, without authority, products that infringe the '358 Patent.

82.     The Accused Products infringe at least one claim of the '358 Patent. By way of example, the ASUS ROG Phone 9 AI2501B (the "Accused Phone") infringes claim 1 of the '358 Patent. Claim 1 of the '358 Patent recites:

1.    An illumination device comprising:

a transparent substrate comprising an emitting area and a peripheral area, wherein the peripheral area is disposed at an edge of the transparent substrate, and the emitting area comprising a plurality of sub-emitting areas; and

a plurality of first metal lines disposed on the transparent substrate, each first metal line has an end connected to a corresponding one of the sub-emitting areas and an opposite end connected to the peripheral area,

wherein each sub-emitting area comprises an insulating layer, a second metal line and an OLED layer, and the second metal line is disposed between the transparent substrate and the OLED layer, the insulating layer is between the first metal lines and the second metal line, each first metal line is overlapped with the second metal line in vertical projection, and one of the first metal lines, which is connected to a first one of the sub-emitting areas, passes through a second one of the sub-emitting areas.

83.    The Accused Phone includes "an illumination device," as shown in an example below with an AMOLED display.



84.    The "illumination device" of the Accused Phone comprises "a transparent substrate comprising an emitting area and a peripheral area, wherein the peripheral area is disposed at an edge of the transparent substrate" as shown in the examples below, showing the emitting area and the peripheral area, where the peripheral area is disposed at an edge of the transparent substrate.



85.    For the "illumination device" of the Accused Phone, "the emitting area compris[es] a plurality of sub-emitting areas," as shown in an example below where the emitting area is comprised of a plurality of sub-emitting areas.



86.    The "illumination device" of the Accused Phone comprises "a plurality of first metal lines disposed on the transparent substrate," as shown in an example below of a top-down view of the illumination device, with layers removed to show the plurality of first metal lines disposed on the transparent substrate (hereinafter labeled in the figures as "substrate").



87.    For the "illumination device" of the Accused Phone, "each first metal line has an end connected to a corresponding one of the sub-emitting areas," as shown in an example below of a top-down view of the illumination device, with layers removed to show each first metal line with an end connected to a corresponding one of the sub-emitting areas.



88.    For the "illumination device" of the Accused Phone, "each first metal line has . . . an opposite end connected to the peripheral area," as shown in an example below of a top-down view of the illumination device, with layers removed to show each first metal line with an opposite end connected to the peripheral area.



89.    For the "illumination device" of the Accused Phone, "each sub-emitting area comprises an insulating layer, a second metal line and an OLED layer, and the second metal line is disposed between the transparent substrate and the OLED layer, the insulating layer is between the first metal lines and the second metal line," as shown below in an example of a scanning electron microscope view of the illumination device at a cross section of the illumination device, showing the second metal line disposed between the transparent substrate and the OLED layer, the insulating layer between the first metal lines and the second metal lines, and each first metal line overlapping with the second metal line in vertical projection.



90.    For the "illumination device" of the Accused Phone, "each first metal line is overlapped with the second metal line in vertical projection," as shown below in an example of a top-down view of the illumination device, with layers removed to show each first metal line overlapping with the second metal line in vertical projection.



91.    For the "illumination device" of the Accused Phone, "one of the first metal lines, which is connected to a first one of the sub-emitting areas, passes through a second one of the sub-emitting areas," as shown in an example below of a top-down view of the illumination device,

with layers removed to show one of the first metal lines connected to the first one of the sub-emitting areas passing through the second one of the sub-emitting areas.



92.    Alternatively, and in addition, ASUS directly infringes by making and selling the Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., LLC v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, ASUS directly infringes through its direct involvement in the activities of its distributors (including related ASUS corporate entities) or subsidiaries, including by selling and offering for sale the Accused Products directly to its distributors or subsidiaries and importing the Accused Products into the United States. ASUS conducts activities that constitute direct infringement. ASUS is also vicariously liable for the infringing conduct performed by others, for example ASUS's distributors and subsidiaries under principles of vicarious liability, including but not limited to the alter ego theory, agency theory,

contract terms, and, for example, because ASUS has the right and ability to (and does) direct and control its distributors' and subsidiaries' infringing acts (including, *e.g.*, the right and ability to stop or limit the infringement), conditions receipt of a benefit to its distributors and subsidiaries on their infringement, and because ASUS receives a direct financial benefit for such infringement.

93.    NeoLayer is also informed and believes, and on this basis alleges, that ASUS has induced infringement of the '358 Patent, in violation of 35 U.S.C. § 271(b), by intentionally aiding and encouraging third parties (including ASUS's vendors, customers, and partners) to use, sell, or offer for sale in the United States and/or import into the United States the Accused Products, having known that the acts it was causing would infringe or have a high probability of infringing the '358 Patent under 35 U.S.C. § 271(a) and with a specific intent that those performing the acts infringe the '358 Patent.

94.    As a result of ASUS's infringement of the '358 Patent, NeoLayer has been damaged. NeoLayer is entitled to recover for damages sustained as a result of ASUS's wrongful acts in an amount yet to be determined.

95.    ASUS has had actual knowledge of its infringement of the '358 Patent since no later than August 12, 2025, when ASUS received NeoLayer's August 5, 2025 letter alleging that ASUS infringed the '358 Patent. NeoLayer is further informed, and on this basis alleges, that ASUS's infringement of the '358 Patent was deliberate and willful, and, therefore, this is an exceptional case warranting an award of enhanced damages for up to three times the actual damages awarded and attorney's fees to NeoLayer pursuant to 35 U.S.C. §§ 284–285.

## IX.    COUNT V: INFRINGEMENT OF U.S. PATENT NO. 8,674,365 ("'365 PATENT")

96.    NeoLayer is informed and believes, and on this basis alleges, that ASUS, agents of ASUS, and/or third parties acting under ASUS's direction and control, have committed acts of

direct infringement under 35 U.S.C. § 271(a) of the '365 Patent literally and/or under the doctrine of equivalents by making, using, selling, offering to sell, and/or importing within this district and elsewhere in the United States, without authority, products that infringe the '365 Patent.

97.     The Accused Products infringe at least one claim of the '365 Patent. By way of example, the ASUS ROG Phone 9 AI2501B (the "Accused Phone") infringes claim 1 of the '365 Patent. Claim 1 of the '365 Patent recites:

1.  An array substrate, comprising:

a substrate; and

a thin film transistor, disposed on the substrate, wherein the thin film transistor comprises:

   a gate electrode, disposed on the substrate;

   a patterned gate insulating layer, disposed on the gate electrode;

   a patterned semiconductor layer, disposed on the patterned gate insulating layer;

   a patterned etching stop layer, disposed on the patterned semiconductor layer;

   a protective layer, disposed on the patterned etching stop layer, wherein the protective layer and the patterned etching stop layer have a plurality of contact openings that partially expose the patterned semiconductor layer; and

   a source electrode and a drain electrode, disposed on the protective layer and the patterned semiconductor layer, and the source electrode and the drain electrode are electrically connected to the patterned semiconductor layer via the contact openings.

98.     The Accused Phone includes "an array substrate" as shown in an example below.



"array substrate"

99.    The "array substrate" of the Accused Phone comprises "a substrate," as shown in an example below of a scanning electron microscope view of the array substrate at a cross section.



"substrate"

100.    The "array substrate" of the Accused Phone comprises "a thin film transistor, disposed on the substrate," as shown in an example below where the thin film transistor is disposed on the substrate.



"thin film transistor"

"substrate"

101.    The "thin film transistor" of the Accused Phone comprises "a gate electrode, disposed on the substrate," as shown in an example below where the gate electrode is disposed on the substrate.



102. The "thin film transistor" of the Accused Phone comprises "a patterned gate insulating layer, disposed on the gate electrode," as shown in an example below where the patterned gate insulating layer is disposed on the gate electrode.



103. The "thin film transistor" of the Accused Phone comprises "a patterned semiconductor layer, disposed on the patterned gate insulating layer," as shown in an example below where the patterned semiconductor layer is disposed on the patterned gate insulating layer.



104.    The "thin film transistor" of the Accused Phone comprises "a patterned etching stop layer, disposed on the patterned semiconductor layer," as shown in an example below where the patterned etching stop layer is disposed on the patterned semiconductor layer.

105.    The "thin film transistor" of the Accused Phone comprises "a protective layer, disposed on the patterned etching stop layer, wherein the protective layer and the patterned etching stop layer have a plurality of contact openings that partially expose the patterned semiconductor layer," as shown in an example below where the protective layer is disposed on the patterned etching stop layer, both of which have a plurality of contact openings that partially expose the patterned semiconductor layer.



106.    The "thin film transistor" of the Accused Phone comprises "a source electrode and a drain electrode, disposed on the protective layer and the patterned semiconductor layer, and the source electrode and the drain electrode are electrically connected to the patterned semiconductor layer via the contact openings," as shown below in an example where the source electrode and the drain electrode are disposed on the protective layer and the patterned semiconductor layer.



107.    For "thin film transistor" of the Accused Phone, "the source electrode and the drain electrode are electrically connected to the patterned semiconductor layer via the contact openings,"

as shown below in an example where the source electrode and the drain electrode are electrically connected to the patterned semiconductor layer via the contact openings.



108.    Alternatively, and in addition, ASUS directly infringes by making and selling the Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs.*, LLC v. Marvell Semiconductor, Inc., 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, ASUS directly infringes through its direct involvement in the activities of its distributors (including related ASUS corporate entities) or subsidiaries, including by selling and offering for sale the Accused Products directly to its distributors or subsidiaries and importing the Accused Products into the United States. ASUS conducts activities that constitute direct infringement. ASUS is also vicariously liable for the infringing conduct performed by others, for example ASUS's distributors and subsidiaries under

principles of vicarious liability, including but not limited to the alter ego theory, agency theory, contract terms, and, for example, because ASUS has the right and ability to (and does) direct and control its distributors' and subsidiaries' infringing acts (including, *e.g.*, the right and ability to stop or limit the infringement), conditions receipt of a benefit to its distributors and subsidiaries on their infringement, and because ASUS receives a direct financial benefit for such infringement.

109.    NeoLayer is also informed and believes, and on this basis alleges, that ASUS has induced infringement of the '365 Patent, in violation of 35 U.S.C. § 271(b), by intentionally aiding and encouraging third parties (including ASUS's vendors, customers, and partners) to use, sell, or offer for sale in the United States and/or import into the United States the Accused Products, having known that the acts it was causing would infringe or have a high probability of infringing the '365 Patent under 35 U.S.C. § 271(a) and with a specific intent that those performing the acts infringe the '365 Patent.

110.    As a result of ASUS's infringement of the '365 Patent, NeoLayer has been damaged. NeoLayer is entitled to recover for damages sustained as a result of ASUS's wrongful acts in an amount yet to be determined.

111.    ASUS has had actual knowledge of its infringement of the '365 Patent since no later than August 12, 2025, when ASUS received NeoLayer's August 5, 2025 letter alleging that ASUS infringed the '365 Patent. NeoLayer is further informed, and on this basis alleges, that ASUS's infringement of the '365 Patent was deliberate and willful, and, therefore, this is an exceptional case warranting an award of enhanced damages for up to three times the actual damages awarded and attorney's fees to NeoLayer pursuant to 35 U.S.C. §§ 284–285.

X.    **COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 11,088,129 ("'129 PATENT")**

112.    NeoLayer is informed and believes, and on this basis alleges, that ASUS, agents of ASUS, and/or third parties acting under ASUS's direction and control, have committed acts of direct infringement under 35 U.S.C. § 271(a) of the '129 Patent literally and/or under the doctrine of equivalents by making, using, selling, offering to sell, and/or importing within this district and elsewhere in the United States, without authority, products that infringe the '129 Patent.

113.    The Accused Products infringe at least one claim of the '129 Patent. By way of example, the ASUS ROG Phone 9 AI2501B (the "Accused Phone") infringes claim 1 of the '129 Patent. Claim 1 of the '129 Patent recites:

1.  A display apparatus comprising:

a substrate;

a first circuit layer disposed on the substrate;

a first adhesive layer disposed on the first circuit layer;

a second circuit layer disposed on the first adhesive layer;

a first conductive element disposed on the second circuit layer and electrically connected to the second circuit layer, wherein the first adhesive layer has a first via, and the first conductive element is electrically connected to the first circuit layer through the first via of the first adhesive layer; and

a display element layer disposed on the second circuit layer and electrically connected to the second circuit layer,

wherein the second circuit layer comprises a thin-film transistor having a gate, a semiconductor pattern and an insulating sublayer disposed between the gate and the semiconductor pattern; the insulating sublayer has a first via disposed outside of the semiconductor pattern; the first conductive element is electrically connected to the first circuit layer through the first via of the insulating sublayer of the thin-film transistor of the second circuit layer and the first via of the first adhesive layer.

114.    The Accused Phone includes "a display apparatus," as shown in an example below with an AMOLED display.

The ROG Phone 9 boasts a cutting-edge **6.78" E6 AMOLED** display, featuring adaptive refresh rates that minimize power usage. Ramp up your gaming experience with a **refresh rate of up to 185 Hz**[11] via Game Genie, while enjoying an ultra-responsive **720 Hz touch sampling rate**. With a **peak brightness of 2500 nits**, visibility remains clear even under direct sunlight, ensuring uninterrupted gaming and movie watching. Plus, its **Delta-E < 1 color accuracy** delivers stunningly accurate visuals.

115.    The "display apparatus" of the Accused Phone comprises "a substrate," as shown in an example below of a scanning electron microscope view of the display apparatus at a cross section, showing the substrate.



116.    The "display apparatus" of the Accused Phone comprises "a first circuit layer disposed on the substrate," as shown in an example below where the first circuit layer is disposed on the substrate.



117.    The "display apparatus" of the Accused Phone comprises "a first adhesive layer disposed on the first circuit layer," as shown in an example below where the first adhesive layer is disposed on the first circuit layer.



"first circuit layer"

"first adhesive layer"

118.    The "display apparatus" of the Accused Phone comprises "a second circuit layer disposed on the first adhesive layer," as shown in an example below where the second circuit layer is disposed on the first adhesive layer.



"second circuit layer"

"first adhesive layer"

119.    The "display apparatus" of the Accused Phone comprises "a first conductive element disposed on the second circuit layer and electrically connected to the second circuit layer, wherein the first adhesive layer has a first via, and the first conductive element is electrically connected to the first circuit layer through the first via of the first adhesive layer," as shown in an example below where the first conductive element is disposed on the second circuit layer and

electrically connected to the second circuit layer, and electrically connected to the first circuit layer through the first via of the first adhesive layer.



120.    The "display apparatus" of the Accused Phone comprises "a display element layer disposed on the second circuit layer and electrically connected to the second circuit layer," as shown in an example below of a top-down view of the display apparatus, with layers removed to show the display element layer disposed on the second circuit layer and electrically connected to the second circuit layer.



121.    The "display apparatus" of the Accused Phone "wherein the second circuit layer comprises a thin-film transistor having a gate, a semiconductor pattern and an insulating sublayer disposed between the gate and the semiconductor pattern," as shown in an example below of the thin-film transistor with the gate, the semiconductor pattern, and the insulating sublayer disposed between the gate and the semiconductor pattern.



122.    For the "display apparatus" of the Accused Phone, "the insulating sublayer has a first via disposed outside of the semiconductor pattern; the first conductive element is electrically connected to the first circuit layer through the first via of the insulating sublayer of the thin-film transistor of the second circuit layer and the first via of the first adhesive layer," as shown in the example below where the first via of the insulating sublayer is disposed outside of the semiconductor pattern, and the first conductive element is electrically connected to the first circuit layer through the first via of the insulating sublayer of the thin-film transistor of the second circuit layer and the first via of the first adhesive layer.



123.    Alternatively, and in addition, ASUS directly infringes by making and selling the Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States, it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., LLC v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, ASUS directly infringes through its direct involvement in the activities of its distributors (including related ASUS corporate entities) or subsidiaries, including by selling and offering for sale the Accused Products directly to its distributors or subsidiaries and importing the Accused Products into the United States. ASUS conducts activities that constitute direct infringement. ASUS is also vicariously liable for the infringing conduct performed by others, for example ASUS's distributors and subsidiaries under principles of vicarious liability, including but not limited to the alter ego theory, agency theory, contract terms, and, for example, because ASUS has the right and ability to (and does) direct and control its distributors' and subsidiaries' infringing acts (including, *e.g.*, the right and ability to

stop or limit the infringement), conditions receipt of a benefit to its distributors and subsidiaries on their infringement, and because ASUS receives a direct financial benefit for such infringement.

124.    NeoLayer is also informed and believes, and on this basis alleges, that ASUS has induced infringement of the '129 Patent, in violation of 35 U.S.C. § 271(b), by intentionally aiding and encouraging third parties (including ASUS's vendors, customers, and partners) to use, sell, or offer for sale in the United States and/or import into the United States the Accused Products, having known that the acts it was causing would infringe or have a high probability of infringing the '129 Patent under 35 U.S.C. § 271(a) and with a specific intent that those performing the acts infringe the '129 Patent.

125.    As a result of ASUS's infringement of the '129 Patent, NeoLayer has been damaged. NeoLayer is entitled to recover for damages sustained as a result of ASUS's wrongful acts in an amount yet to be determined.

126.    ASUS has had actual knowledge of its infringement of the '129 Patent since no later than August 12, 2025, when ASUS received NeoLayer's August 5, 2025 letter alleging that ASUS infringed the '129 Patent. NeoLayer is further informed, and on this basis alleges, that ASUS's infringement of the '129 Patent was deliberate and willful, and, therefore, this is an exceptional case warranting an award of enhanced damages for up to three times the actual damages awarded and attorney's fees to NeoLayer pursuant to 35 U.S.C. §§ 284–285.

127.    ASUS's infringing acts and practices have caused and are causing immediate and irreparable harm to NeoLayer.

## XI.    <u>JURY DEMAND</u>

128.    NeoLayer hereby demands a trial by jury on all issues.

## XII.    <u>PRAYER</u>

129.    Wherefore, NeoLayer prays for entry of judgment as follows:

130.    A judgment in favor of NeoLayer that ASUS has infringed, directly and/or indirectly, and is infringing, either literally and/or under the doctrine of equivalents, the Asserted Patents;

131.    A judgment in favor of NeoLayer that ASUS's infringement has been and continues to be willful; in the alternative, a judgment in favor of NeoLayer that ASUS's infringement is willful and continues to be willful as of the date of this Complaint;

132.    An award of damages in favor of NeoLayer adequate to compensate NeoLayer for ASUS's infringement of the Asserted Patents which shall in no event be less than a reasonable royalty, together with interest and costs as fixed by the court pursuant to 35 U.S.C. § 284;

133.    A permanent injunction in favor of NeoLayer against ASUS enjoining ASUS, its officers, agents, employees, and others acting in privity, from further infringement of the Asserted Patents;

134.    An award of an ongoing royalty for ASUS's post-judgment infringement in the event a permanent injunction is not granted;

135.    An award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law in an amount deemed just and appropriate by the Court;

136.    An award of costs and expenses as deemed appropriate by the Court; and

137.    Any other legal or equitable relief to which NeoLayer is justly entitled.

Dated: December 31, 2025

Respectfully submitted,

/s/ Warren J. McCarty, III by permission Andrea Fair

Warren J. McCarty, III
State Bar No. 24107857
**THE MCCARTY FIRM, P.C.**
100 Crescent Court, Floor 7
Dallas, Texas 75201
(214) 459-3196
wmccarty@mccartyfirm.com

Andrea L. Fair
Texas Bar No. 24078488
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
Tel: 903-757-6400
Fax: 903-757-2323
andrea@millerfairhenry.com

***Attorneys for Plaintiff***
**NeoLayer LLC**